Having the misfortune to differ in opinion with my brothers on one point in the case, I must take the liberty of stating my reason; and to make myself the more intelligible, I will state the case as it appears in the record. This is a petition for an account and distribution of the personal estate of an intestate, Hezekiah Bonham. It was filed in the County Court by Ann Henry, Nathaniel Bonham, and six other persons, in December, 1842, and it states: "That Hezekiah Bonham died some years since intestate and possessed of or entitled to many negroes and to money, notes, bonds, and other personal property; that your petitioners are the distributees and heirs at law of the said Hezekiah; that after his death administration of his personal estate was granted to Neil Henry, and that he had it in possession a considerable time longer than in law he was entitled to keep it, and then died; and that the said administration was thereupon granted to Charles Henry and Archibald F. Murphy; that the said estate required very little delay in settling with the heirs, your petitioners; for your petitioners *Page 197 
show that there were no difficulties or very little to prevent the said administrators from paying and settling with the heirs aforesaid; that the said Henry and Murphy continue to detain the said negroes and other property, although called on by your petitioners to settle with them as the distributees and heirs as aforesaid." The prayer is that the administrators may be decreed to settle and pay over "to said heirs their portion, or to settle with the court, so that your petitioners may receive their due proportions; and also that your worships will appoint three commissioners to divide the said negroes among the heirs as aforesaid," and for general relief.
The answer admits that Neil Henry administered on (282) the estate of the intestate Hezekiah Bonham, and states that the defendants were his sureties for the administration, and that the said Neil died intestate and Nathan Bonham is his administrator. It then insists that the defendants "are bound to account to the administrator of Neil Henry, and not the present petitioner, Ann Henry or her children"; and it proceeds further thus: "These defendants show that Neil Henry committed waste in the management of the estate to the amount of about $800, and is responsible to the distributees of the said Hezekiah therefor; and they maintain that the estate of the said Neil is responsible for this deficiency, and that these defendants, having the share of the estate of the said Hezekiah in their hands, to which the representatives are entitled, they have a right to retain the same or so much thereof as shall be sufficient to satisfy the said deficiency."
In June, 1844, it was referred to the clerk "to take an account"; and in September following he reported: first, an account between Neil Henry, the first administrator, and the estate, on which a balance of $1,673.39 was found due to the estate on 1 January, 1841; and, secondly, an account between the present defendants as administrators and the estate, on which a balance of $2,179.78 was found due to the estate on 13 July, 1844, arising from the hire of negroes, sales of property and money received on bonds to the intestate.
The defendants excepted to the report because "they are not liable for the amount reported to be due from Neil Henry, but only responsible as administrators de bonis non for such sums as have been by them received."
From a decree in the County Court in favor of the plaintiffs, the defendants appealed; and in the Superior Court the exception was overruled and the report confirmed, and a decree made, in which it was declared "that the petitioners are entitled to distribution of the estate of Hezekiah Bonham, deceased, and *Page 198 
(283) that Neil Henry administered on the said estate and gave for sureties to his administration bond the defendants, Charles Henry and Archibald F. Murphy; that the said Neil died intestate without having administered the said estate of the said Hezekiah and made distribution thereof among his next of kin; at the time of his death the said Neil had in his hands of the said estate the sum of $1,673.39 unadministered, on which he was accountable for interest from 1 January, 1841, making up to this sum of $709.51; that there is in the hands of the defendants, Henry and Murphy, as administrators de bonisnon of the intestate Hezekiah, the sum of $2,179.78, without taking into account the balance in the hands of Neil Henry at the time of his death, with the interest thereon; for which balance with interest as aforesaid the defendants are liable; and that the whole liability of the defendants to the plaintiffs is for the sum of $4,562.68, with interest on $2,179.78 from 10 September, 1844, and on $1,673.39 from this time until paid." There was a decree accordingly for payment to the plaintiffs and for costs in both courts; and the defendants appealed.
It has been stated at the bar that Ann Henry, one of the plaintiffs, is a daughter of the intestate Bonham, and the widow of Neil Henry, the first administrator of Bonham; and that the questions made at the hearing, and which the parties desired to present here, are whether the distributive share of the wife vested in her husband or survived to her; and whether the defendants are chargeable in this suit for the devastavit, if any, of Neil Henry. But a preliminary difficulty exists as to the facts necessary to raise those questions. It is not stated in the pleadings that Neil Henry was the husband of the petitioner Ann, or had any connection with the intestate's estate, except as administrator. There is a vague statement in the (284) answer that the defendants are bound to account to the administrator of Neil Henry, and not to the petitioner, Ann, or her children. But why he should account to one in preference to the other, or, indeed, to either, is not suggested, and can be conjectured only from the information communicated by the bar. The Court cannot, then, determine the question as between the husband and wife, as the marriage is not alleged, and consequently could not be declared.
So in respect to the other question, the inquiry is necessarily presented in the first instance, whether the plaintiffs have a right to the estate, before it can be considered whether the defendants are to be charged with this or that demand. It is indispensable that a plaintiff should in his pleading give *Page 199 
himself a title to the thing he demands, for the court cannot declare one which is not set up. These plaintiffs say they are the "heirs at law and distributees" of the intestate Bonham, and they pray that the defendants may be decreed to pay to "the said heirs" their portions of the estate, and that the negroes may be divided "among the heirs as aforesaid." The plaintiffs, therefore, claim as "the heirs and distributees" of the intestate. The statute distributes the personal estate of an intestate among his "widow and children or next of kin in equal degree or their legal representatives," and not to the heirs. The term "heirs" has no proper signification in respect to the right of succeeding to personalty. It is often used in wills and in inaccurate conversation to signify, in an improper sense, children, sometimes, and at other times, descendants, or issue, or nearest of kin, or the persons entitled under the statute of distributions; and these different meanings are arrived at from the context. But it, surely, would not be tolerated in pleading as expressing either of those senses, or constituting a title under the statute to the personal estate of an intestate, after debts paid. Upon that point, however, my brethren and I concur.
The other term by which the plaintiffs describe themselves (285) and make title is yet more objectionable, as I conceive. "Heirs" is an English word and a term of the law, and is therefore understood, though improperly applied to this subject. But "distributees" is not a word at all known in the law or the language. Until my brothers told me that they understood what it meant, I must humbly beg pardon for saying that I looked upon it as a newly invented barbarism, and without any settled sense. Indeed, I do not now understand from what source the meaning of the term is derived. I believe it is a phrase which is sometimes used in common parlance by persons who are not of the profession and do not aim at accuracy in speaking on legal subjects. Some members of the bar may have, thence, fallen into the use of it sometimes in discussion, when precision of expression is of the less importance, as there is opportunity for explanation. But those who indulge themselves in that mode of speech are so sensible of its impropriety that, as Judge Henderson remarked, in Croom v. Herring,11 N.C. 393, they seldom use "distributee" without an apology; knowing that it is not to be found in any English dictionary or English book — much less in a law book. I believe I may add that, up to this day, it has not obtained admission into any American dictionary, though at least one of them has been supposed to have taken in every word that could possibly be tolerated. But when used it has not seemed to me, at least, to be *Page 200 
in any definite sense. Like "heirs" in reference to personalty, it has appeared to be intended sometimes to designate children by it; at others, the widow and children, or all the kindred or a single one that may be entitled to distributive shares or the whole property by original right or by representation, or even a person entitled to a share by assignment. I know I have heard a single child called "sole distributee," and also that one who had purchased a share "had become a distributee." (286) So, I had really supposed that there was no meaning attached to the word by itself, in the mind of any one, but that it varied in vulgar use with the context; and that, therefore, it was wholly inappropriate to describe a title to property in pleading and entries. In wills or contracts the courts would be obliged to receive it in some sense, and would endeavor to discover that which would subserve the intention in the particular case. If, perchance, it were to find its way into a statute, the judicial duty would be the same. But that would not render it proper to transfer it into judicial proceedings. For legislators, like testators, take the right to puzzle judges as much as they please, and often do not trouble themselves much in the selection of terms. The same latitude, however, is not to be claimed by pleaders and clerks. Pleadings and the entries of judgments and decrees ought to be in the language of the law. For them there are precedents, settled long ago by the wise and the learned, and used from generation to generation by those who were and are as discreet and well informed as any among us can claim to be. I think it, and always thought it right to observe them, myself, and would fain beg the respect of others for them; asking, why despite should be done to forms venerable for their antiquity, certain in their meaning, and, for those reasons, insuring order and precision in the dispatch of business and the sense of records? The lawyer who scorns to follow forms may depend upon it that he will not long love the law itself, for in refusing to conform to the patterns set by the law, he does despite to its essential elements of precision and certainty, and to some extent brings into disrepute the science itself. Why should terms, in which pleadings and entries have been expressed time out of mind, be rejected, and in their room words made and adopted which no two men here always use in the same sense, and which would be altogether unintelligible, for example, in Westminster Hall, and, indeed, in all (287) other countries where our law and language prevail? I own, I can see no reason for it; but, on the contrary, I am sure that it would greatly promote the case of pleaders and judges and the certainty of the law to adhere to the *Page 201 
precedents as examples of the forms of proceeding, as well as standards for settling the principles of the law itself. One departure from the rule invites another, and this proceeds until no rule is left. I think judges, with whom is the charge of preserving the law in its integrity and administering it uniformly, ought to reverence its established forms and steadfastly insist on their due observance as the best guards of the law itself. It is always safe, stare super antiquas vias. In this case, for instance, if an inquiry were directed to ascertain who are entitled to the personal estate of the deceased, and in what proportions, it surely would not be ordered in the terms of the petition, that is, to inquire "who are the heirs and distributees of the intestate Bonham." If it would, I must say it would be for the first time in this Court since I have been a member of it. The word has now and then been in bills, but always with something else which enabled the Court to reject it and then have enough to give the parties a title, as by saying that the plaintiffs were the children of the intestate, or the like. But I am nearly confident that no decree or order has passed under my notice with "distributees" in it, nor decree made upon a bill describing the title of the plaintiffs by it alone. I feel bound, therefore, to express the opinion that the petition ought to be dismissed with costs. I should, perhaps, have no objection to remanding the case, if it had been asked, so as to let in amendments; as it is probable the plaintiffs may be the widow and children of Bonham. But in truth, the petition is so defective and all the proceedings in the cause so very loose and informal that the needful amendments would amount to much the same as a new (288) petition. Besides, the questions between the parties can be better raised by a bill making the administrator of Neil Henry a party, so as to make his estate, if any, directly liable for his devastavit. But as my brothers think differently, the cause must, of course, be disposed of as they may order.
PER CURIAM. Petition to be dismissed, unless the plaintiffs apply at the next term to hear the cause remanded.
Cited: Boyd v. Small. 56 N.C. 42. *Page 202